UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:08-CR-130-1 |
| v. | ) | |
| | ) | *Collier/Lee* |
| PHILLIP PATRICK | ) | |

**REPORT AND RECOMMENDATION**

**I.     Introduction**

Defendant Phillip Patrick ("Patrick") filed a motion to suppress all evidence obtained as a result of the interception of wire communications ("wiretaps") stemming from a warrant requesting wiretaps, and order authorizing those wiretaps, issued November 1, 2006 [Doc. 46]. The district court referred the motion for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), (C) [Doc. 48]. The parties have filed memoranda addressing the issues raised in the pending motions [Doc. 47, 49], which I have carefully reviewed and fully considered. In summary, I find no constitutional violation with respect to the issues raised in the pending motion to suppress. Therefore, for the reasons set forth herein, I **RECOMMEND** Patrick's motion to suppress be **DENIED**.

**II.    Background**

In 2006, agents of the Drug Enforcement Administration ("DEA") Task Force operating in Chattanooga, Tennessee, conducted an investigation of Patrick and several others who were suspected of conspiring to distribute controlled substances, laundering money, possessing firearms in furtherance of drug trafficking crimes, and other related offenses. The investigation used several traditional law enforcement techniques, including physical surveillance, search warrants, infiltration, use of pen registers, and other methods. On November 1, 2006, the Assistant United States Attorney presented the United States District Court an application for an order authorizing interception of

wire communications over a cellular telephone subscribed to and used by Patrick. The application attached a 36-page affidavit by DEA Task Force Officer James C. Hixson, who was participating in the investigation and served as the application/affidavit's affiant [Doc. 47 Ex. 1, at 15–50 ("Aff.")]. That same day, United States District Judge Harry Mattice signed an order authorizing the interception of relevant wire communications over the target telephone [*id.* at 51–57].

On November 25, 2008, a federal grand jury returned a six-count indictment against Patrick and a co-defendant, charging Patrick with conspiracy to distribute five kilograms or more of cocaine, knowingly possessing a firearm in furtherance of a drug trafficking crime, possessing a firearm after having been convicted of a felony, and distributing cocaine on three occasions. Patrick filed the instant motion to suppress on May 4, 2009, and the United States timely responded.

**III.     Analysis**

Patrick states two grounds for suppressing the wiretap evidence. First, he contends the requisite probable cause was absent because the wiretap warrant did not establish the veracity and reliability of the informants it used, and the remaining facts of the affidavit are insufficient to give rise to probable cause. Second, he argues the warrant and affidavit failed to establish the necessity requirement for wiretaps under Title III of the Omnibus Crime Control and Safe Streets Act of 1968,

18 U.S.C. § 2518 ("Title III").[1]

### A. Probable Cause

Under Sixth Circuit law, "[t]he basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III . . . ." *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). *Alfano* provided the standard for determining probable cause under Title III:

> [T]here is no specific formula that must be met for a warrant, and that evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Under this standard, the question that must be decided in issuing a warrant is whether there is probable cause to believe that evidence of a crime will be uncovered.

838 F.2d at 161–62. That is, there must be a "fair probability," but more than a "mere suspicion," that a wiretap will discover particular evidence of a crime. *Id.* at 162. Additionally, because "the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at the time, 'great deference' is normally paid to the determination of an issuing judge." *Id.*; *accord United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000).

Where a defendant challenges the veracity and reliability of an informant whose information

---

[1] Title III states in relevant part:

> (1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
>  . . .
> (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .

18 U.S.C. § 2518.

3

established the probable cause on which a warrant relied, a judge must be able to conclude "from the totality of the circumstances, 'including the "veracity" and "basis" of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000) (quoting *Gates*, 462 U.S. at 238). Here, Patrick objects to the affidavit's reliance on three sources: Confidential Source 1 ("CS-1"), Confidential Source 2 ("CS-2"), and a Blake Curry.

### 1. CS-1

Patrick objects to the affidavit's reliance on information from CS-1 because, as the government concedes, the affidavit does not establish CS-1's past reliability.

"While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, . . . in the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration." *United States v. Jackson*, 470 F.3d 299, 307 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005)). The Sixth Circuit has elaborated on the independent corroboration requirement:

> [W]hile an affidavit must state facts supporting an independent judicial determination that the information is reliable, those facts need not take any particular form. The affidavit could state that police corroborated significant parts of the informant's story. Or the affiant could attest "with some detail" that the informant provided reliable information in the past. Or there could be other indicia of the informant's reliability, such as a detailed description of what the informant observed first-hand, or the willingness of the informant to reveal his or her name. As long as the issuing judge can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause.

*United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005) (internal citations omitted).

Here, the information provided by CS-1 that appears on the affidavit's face is sufficient to conclude CS-1 was a reliable source, notwithstanding the lack of evidence establishing his or her past reliability. Agent Hixson stated that "[i]nformation provided by CS-1 is consistent with what

4

has been learned from independent investigative activity, including pen register analysis and information from other human sources." [Aff. ¶ 15.] CS-1 provided a detailed description of the amount of drugs Patrick received and kept in a stash house, Patrick's reason for using that stash house (his being robbed in 2004), and the location of the stash house in Chattanooga [*id.* ¶ 18]. CS-1 based his or her description on his or her knowledge of Patrick for many years, including learning of Patrick's involvement in distributing illegal narcotics in 2000 [*id.* ¶ 16]. While CS-1 was incorrect in suggesting the Internal Revenue Service had investigated Patrick's finances, he or she was correct in identifying two businesses, operated by Patrick, which were registered in the names of Patrick's relatives because Patrick is a convicted felon [*id.* ¶ 21]. Lastly, CS-1 independently identified the wiretap's target telephone as that which Patrick used to conduct his drug transactions [*id.* ¶ 19].

As the government concedes, any one of these pieces of evidence, standing alone, would be insufficient to establish probable cause. However, in reviewing an affidavit supporting an application for a Title III wiretap, a court does not look to pieces of evidence standing independently from one another, but to the totality of the affidavit. *Gates*, 462 U.S. at 238. Taken together and read in light of other evidence in the affidavit, CS-1's assertions go to establishing sufficient probable cause supporting the affidavit.

    2.  *CS-2*

Patrick points out, correctly, that the affidavit does not attempt to establish CS-2's past reliability. As noted above, "[w]hen, as here, a warrant affidavit provides no indicia of an informant's reliability, 'courts insist that the affidavit contain substantial independent police corroboration.'" *United States v. Gunter*, 266 F. App'x 415, 417 (6th Cir. 2008) (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005)). "Such independent corroboration may be

5

established, however, by a police monitored, controlled purchase . . . ." *Id.*

Here, the affidavit clearly establishes CS-2's participation in at least three separate controlled buys [Aff. ¶¶ 30–41]. Immediately after each controlled buy, Agent Hixson took from CS-2's possession illegal substances received from Patrick during the transaction. During the last controlled buy, Agent Hixson searched CS-2's vehicle for contraband both before and after his meeting with Patrick, finding no contraband either time; he also supplied CS-2 with Official Authorized Funds and an electronic monitoring device [*id.* ¶¶ 36, 41]. I find these three transactions, conducted using controlled police procedures, adequately support CS-2's veracity and reliability. *See Gunter*, 266 F. App'x at 418 ("If one such purchase was sufficient to corroborate an informant's statements in [*United States v. Coffee*, 434 F.3d 887 (6th Cir. 2006)], then two purchases will more than suffice in the instant case.").

### 3. *Blake Curry*

Patrick objects to reliance on information from Curry because the affidavit does not establish Curry's past reliability, fails to state the crime for which Curry was being investigated when he provided information to investigators, and could not identify the telephone number he used to contact Patrick. While Patrick is correct, other evidence provided by Curry supplies sufficient information to establish his reliability. First, in contrast to the other two confidential informants, Curry is willing to reveal his identity on the face of the affidavit. Second, Curry provides a detailed account of an incident where Patrick threatened Curry unless Curry paid him what amounted to a ransom [Aff. ¶ 27]. Curry's parents provide an account of the incident that largely corroborates Curry's own, even if the two accounts differ as to the exact amount of money Patrick demanded [*id.* ¶¶ 28–29]. Both accounts agree that Curry's parents had to pay a significant sum of money in response to Patrick's demand in order to avert him from harming Curry, and agree on the location

6

where the exchange of money took place. Taken together, these indicia, on which a court may permissibly rely in a probable cause inquiry, *McCraven*, 401 F.3d at 697, indicate Curry was a sufficiently reliable informant.

Based on the totality of the evidence presented on the affidavit's face, and the required due deference to the issuing judge, I **FIND** the affidavit provides ample probable cause for the order authorizing the wiretap.

    **B.    Necessity**

Title III requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting 18 U.S.C. § 2518(1)(c)). This "necessity requirement" exists "to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (quoting *Alfano*, 838 F.2d at 163). The requirement "protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *Id.* (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

The necessity requirement does not require the government "to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. Instead, "[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985). In making this determination, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents," as long as the allegations in the

7

affidavit contain some factual relation to the circumstances at hand. *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989); *accord United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977).

Contrary to Patrick's contentions, Agent Hixson's affidavit in support of the warrant application sets forth sufficient information to comply with the necessity requirement of Title III. Patrick has not satisfied his burden of overcoming the presumption that the wiretap authorization order signed by Judge Mattice on November 1, 2006, is proper. *See United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."). Because Hixson's affidavit shows the investigators did give serious consideration to non-wiretap investigative techniques prior to applying for the authority to wiretap and informed the district judge of the basis for the investigators' belief that such non-wiretap investigative techniques either had been or would likely be inadequate, the affidavit satisfies the necessity requirement.

The affidavit is a detailed, 36-page document, at the beginning of which Hixson describes his qualifications as a law enforcement officer and affiant [Aff. ¶¶ 2–6], gives grounds for seeking the wiretap authorization [*id.* ¶¶ 7–12], and states no prior federal applications for interception of communications involving the target telephone had been made [*id.* ¶ 13]. The affidavit lists eleven traditional investigative techniques and explains how each of those techniques proved inadequate, counterproductive, or dangerous to the officers involved in the investigation [*id.* ¶¶ 47–63]. Agent Hixson based these conclusions on his experience as a law enforcement officer:

> Based on your Affiant's training and experience, it is your Affiant's belief that the interception of wire communications of **TARGET TELEPHONE** #1, used in conjunction with other investigative techniques, is the only available mechanism with a reasonable likelihood of identifying the entire organization operating in

8

Chattanooga, Whitwell, and South Pittsburg, Tennessee, and elsewhere, as well as the source of their illegal drugs which is potentially based in Atlanta, Georgia.

[*Id.* ¶ 45.] Hixson also stated, again based on his training and experience, that "[i]nvestigative procedures that are usually employed in investigations of this type of criminal case have been tried and failed, reasonably appear unlikely to succeed if they are tried, or are too dangerous to employ . . . ." [*Id.*]

Hixson first discussed physical surveillance, noting that Patrick's conversations with suppliers in Atlanta were "significantly removed geographically" from Chattanooga, and that the "requested Court authorization would enable investigators to pursue these sources of supply that to date have eluded positive identification." [*Id.* ¶ 46.] He noted that physical surveillance had already been attempted on numerous occasions, but would not conclusively establish the elements of the violations and the identity and role of the conspirators [*id.* ¶ 48]. Physical surveillance also entailed a high probability of being noticed, making Patrick and his co-conspirators more cautious and compromising the investigation [*id.* ¶ 49]. Hixson stated the physical layout of Patrick's residence made undetected surveillance difficult, and noted Patrick's proclivity to set meetings at different locations on short notice [*id.*]. Lastly, Hixson stated physical surveillance to that point had been ineffective in identifying the extent of the co-conspirators' involvement or the source of their supply [*id.*].

Hixson next stated his belief that grand jury subpoenas would not be successful in achieving the investigation's goals. Subpoenaed co-conspirators would invoke their Fifth Amendment rights to silence and would alert other members of their organization [*id.* ¶ 50]. While Hixson admitted information obtained from document subpoenas would be useful, he said it would "fall short of providing the sole basis for any prosecution." [*Id.* ¶ 51.] Likewise, interviews of subjects or associates involved in the conspiracy would yield insufficient, untruthful, or incomplete information,

9

and most importantly, would alert other members of the conspiracy to the investigation, potentially jeopardizing the safety of confidential informants [*id.* ¶ 52].

With regard to search warrants, Hixson stated that because Patrick used several locations to conceal evidence and all those locations had not been identified, search warrants would alert the targets of the investigation and frustrate its purpose, in addition to proving ineffective [*id.* ¶ 53]. Hixson also stated undercover officers had been unable to infiltrate the organization, especially because Patrick distrusted individuals not closely related to him [*id.* ¶¶ 54–55].

As discussed in Part III.A., Hixson used two cooperating witnesses in the course of the investigation. While the confidential informants "met some of the principal members" of the organization, the confidential informants did not hold leadership positions and were not able to establish themselves in positions of authority within the organization. Moreover, they could not "furnish information that would fully identify all members of this organization, identify conclusively the source of supply of drugs, provide details about the delivery of drugs, quantity of drugs received, or financial arrangements relative to the purchase of large amount of drugs by members of this organization," nor could they identify the method of drug shipment [*id.* ¶ 56]. Finally, the confidential informants were not "trusted with the intimate details of the organization by the principal members." [*Id.*]

Hixson stated that while undercover drug purchases "have provided some evidence concerning the illegal activities of the group and corroborated information provided by some sources of information, they have failed to identify all members of the conspiracy or the full scope and extent of criminal activity." [*Id.* ¶ 58.] He also opined that while pen registers had been used in the investigation, they were of limited value because they did not identify individuals involved in suspected drug-related conversations or the content of those conversations; rather, the pen register

10

information was used primarily to corroborate information provided by confidential informants [*id.* ¶ 59]. Hixson noted a pole camera had been used during the investigation, but had not produced useful evidence because of the terrain, distance from Patrick's residence, and tendency of the organization's members to hide their illegal activity from public view [*id.* ¶ 61]. Similarly, Hixson doubted the efficacy of trash pulls because individuals involved in distributing drugs are generally aware of this technique and prevent potential evidence from entering the trash [*id.* ¶ 62]. Moreover, based on Hixson's experience with trash pulls and trash collectors in the area, that technique created a risk of exposing the investigation to its targets [*id.*]. Finally, Hixson stated the investigation had intercepted a call from another wiretap, but that call did not contain a conversation with the target of that investigation [*id.* ¶ 63].

Based on the foregoing details, Agent Hixson's affidavit in support of the November 1, 2006 application adequately addressed investigative alternatives and the belief that the alternatives would not be adequate in satisfaction of the necessity requirement of Title III. *See Alfano*, 838 F.2d at 163–64; *Lambert*, 771 F.2d at 91. The affidavit demonstrates Agent Hixson considered investigative alternatives, and even employed many of them for a while, but rejected them because they proved inadequate. The affidavit also shows Agent Hixson did not seek authorization for the wiretaps at the outset of the investigation into the drug trafficking conspiracy/organization, but instead tried alternative investigative methods and found them unsuccessful to satisfy the goals of the investigation prior to seeking federal court authorization for the wiretap.

Thus, I **FIND** the affidavit and application satisfy the necessity requirement of Title III. *See, e.g.*, *Stewart*, 306 F.3d at 305 ("In endeavoring to secure a wiretap warrant, the government need not prove the impossibility of other means of obtaining information."); *Lambert*, 771 F.2d at 91 (holding the government's obligation under § 2518(1)(c) was satisfied by the affidavit's explanation

11

that other investigative measures could not reasonably be used because of the subject's extreme suspicion that his activities were being monitored, and the fact that alternative investigative procedures, such as directly questioning the subject and his associates, "would likely alert the subjects to the presence and scope of the investigation").

**IV.     Conclusion**

For the reasons stated herein, I **RECOMMEND** that Patrick's motion to suppress [Doc. 46] be **DENIED**.[2]

        s/*Susan K. Lee*
        SUSAN K. LEE
        UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).